(No. 22669.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FAY PAYNE, Plaintiff in Error.

*Opinion filed February 15, 1935.*

R. E. SMITH, for plaintiff in error.

OTTO KERNER, Attorney General, GEORGE W. HOWARD, JR., State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

Herman Harold Rich, Clarence Russell Sefried, Raymond Bailey, Virgil Summers, Fay Payne and Lillie S. Riggs were indicted in the circuit court of Jefferson county for the murder of Rosier Green. Rich entered a plea of guilty and was sentenced to a term of fourteen years' imprisonment in the penitentiary. The other defendants, except Lillie S. Riggs, were tried together by a jury and a sentence of seventeen years' imprisonment in the penitentiary was imposed upon each of them. Payne sued out this writ of error.

Rosier Green and his brother, Wiley Green, resided about nine miles east of Mt. Vernon and two miles southeast of Bluford, in Jefferson county. The house is on the east side of a highway extending north and south and consists of two small rooms of log construction joined at the southeast corner of one room and the northwest corner of the other. A screened porch extends along the south side of the north room and on the west side of the south and east room, forming a corner at that part of the house. Rosier Green and Wiley Green, and the latter's grandson, eight years of age, were the only occupants of the house on December 8, 1933. The evidence for the People is that three or four days previous to December 8, 1933, Fay Payne, the plaintiff in error, met Rich in Mt. Vernon and told him that a man residing near Bluford was supposed to have $3000 in money upon his premises which could easily be obtained. Thereafter Rich met the plaintiff in error and requested him to go to the home of Ross Moore and wait for him. Rich then went to an apartment

occupied by Sefried and there met Sefried, Summers and Bailey. These four men went to the home of Moore. The plaintiff in error was already there, and related to Sefried, Summers and Bailey the substance of the statement he previously had made to Rich. He said that he could not accompany the four men to obtain the money for he had to have an alibi but would show them the house, and if they obtained $3000 he expected to receive $500. Sefried, Summers, Bailey, Rich and the plaintiff in error on the night of December 7, 1933, about dark, went in a Ford V-8 automobile driven by Bailey but directed by the plaintiff in error, east from Mt. Vernon to the second cross-road east of the Illinois Central railroad and turned and drove south for some distance. After driving up and down the road the plaintiff in error was unable to point out the residence of the man who he thought had the money on his premises and they returned to Mt. Vernon. The plaintiff in error told Sefried to meet him at the home of Moore the following morning and he would have a way to take him out and show him the house which he failed to find the previous night. It was agreed that Sefried, Summers, Bailey and Rich, but not the plaintiff in error, should meet at 5:30 o'clock the following night at an iron bridge about a mile east of Mt. Vernon. The four men, accompanied by Mrs. Bailey, met at the bridge, and the latter was taken back to Mt. Vernon. The men then drove east and south to the house which Sefried identified, reaching there about 6:30 o'clock. All of the men were armed and all of them left the automobile and went toward the house except Bailey, who drove the automobile some distance south of the house. It was agreed that when a light signal was flashed to him by one of the other men he would drive back north and stop near the house. Bailey received the signal, drove back, and when about opposite the house sounded the automobile horn. Wiley Green saw the automobile pass the house and it appeared to him to stop and

that the lights were turned off. When the automobile horn was sounded Rich and Sefried were at the south part of the house and Summers was in the rear. Rosier Green went to the porch and toward Rich and Sefried. Rich approached Green and pointed a revolver at him, and the latter started back toward the front door and began shouting. Rich and Sefried followed him. Wiley Green about the same time went to the porch door with a revolver in his hand, and, according to his testimony, as he reached the door he heard two shots fired. He then shot and afterward heard several more shots fired. He also used a shotgun and fired at the automobile as it moved away. Rich testified that Wiley Green was the first to fire and that he (Rich) then fired, and after that time he heard several other shots fired. Rosier Green was struck on the head and was shot in the right side of his body. Sefried was shot through the left ear. Wiley Green went to the home of another brother residing in the vicinity to have him notify a doctor, and he then immediately returned home. Rosier Green lived about twenty minutes after the return of Wiley but died before the doctor arrived. Immediately after the shooting the defendants departed and by an indirect route returned to Mt. Vernon. The following morning Payne went to Sefried's apartment and met Bailey and Rich. He asked Rich how they "got along" the previous night, and Rich replied, "Not so good; somebody got hurt." Payne then said that he had better leave.

The defense was an alibi. The plaintiff in error testified in his own behalf that on December 7, 1933, he did not see Rich, as the latter testified, and that he was at his home in Mt. Vernon until he left for his father's farm in Wayne county, where he went to meet his sister, who had come from St. Louis for a visit. He reached there about 12:00 o'clock and remained until about 5:00 o'clock in the afternoon, when his brother and two sisters took him back to Mt. Vernon in an automobile. They stayed in the auto-

mobile and talked until about 6:00 o'clock. He went to Bluford on December 8 in an automobile driven by Lillie S. Riggs and afterward went to his father's home, reaching there about 3:00 o'clock and remained all night and until about 9:00 o'clock the following morning. At that time he went to the hard road, where he previously had agreed to meet Mrs. Riggs, and he returned with her to Mt. Vernon. He testified that he became acquainted with Sefried when they met in the court room; that he had met Summers at the time of their arrest; that he had met Bailey a few times, and had known Rich for about six months. He denied that he told any of the defendants that anyone had money which might be obtained by a robbery, or that he entered into a conspiracy with the other defendants, or that he was to receive any part of the proceeds of a robbery.

Rose Payne, the mother of the plaintiff in error, Albert Payne, a brother, and Olla Payne, a sister, corroborated the testimony of the plaintiff in error that he was at the home of his father on December 7 and remained there until about 5:00 o'clock; that he was again at the same place the following day at about 3:00 o'clock and remained all night and until 9:00 o'clock the following morning, and was not away from the home of his father between those hours. Mrs. Terrell, another sister, offered corroborative testimony concerning the plaintiff in error's presence at the home of his father on December 7, 1933.

Each of the defendants testified in his own behalf except Sefried. Three witnesses testified in support of the alibi of Bailey with respect to his movements on December 7 and 8, and there was some testimony as to his whereabouts on December 9. Bailey admitted that Rich approached him about a week previous to the time Green was killed, but he told Rich he would have nothing to do with the proposition which Rich made. He also admitted that he had been informed through "underground sources" that a revolver similar to one he owned had been taken to the home

of his sister in Terre Haute after Green was killed, and that he went to her home to obtain it. Two witnesses testified that Summers was at his home at 5:30 or 5:45 o'clock on December 8, 1933, had supper there and remained at home all night. Two witnesses testified that Sefried was working at the home of Vearl C. Adams all day on December 8, 1933, and he remained all night. A third witness testified that Sefried was at the home of Adams from 5:30 o'clock in the evening and remained all night on the date mentioned. In rebuttal, a witness for the People testified that he and Bailey were in jail together in Pocahontas, Arkansas, and Bailey asked him, "Did you ever get in a stick-up or a scrape where anybody got killed?" When the witness replied that he had not, Bailey said that he had; that on December 8 he and other boys went into the country, drove past a house and sounded their automobile horn; that a man came to the door and they pointed a gun at him and the man ran and shouted; that they shot, and another man came to the door and shot, "and there was a lot of shooting." Another witness testified that while he was in the county jail of Franklin county, Summers, in the presence of himself and other witnesses, said, "We are all going to stand pat and fix an alibi and try to lay all the blame on Rich." This witness was corroborated by one of the persons in whose presence the statement was testified to have been made.

Several errors are urged for a reversal of the judgment. Two of them relate to the overruling of motions for a bill of particulars and for a severance. It is also contended there was error in the giving of one instruction and in the court's refusal to give another. Complaint is also made of prejudicial remarks in the argument of the prosecuting attorney. Lastly, it is urged that the testimony upon which the conviction rests is largely that of an accomplice, and that the evidence is insufficient to support a verdict.

The rule with respect to granting a motion for a bill of particulars is, that where the charge in the indictment is so general that the accused cannot properly prepare his defense without a more specific statement of the charge a bill of particulars should be required by the court. (*People v. Gerold,* 265 Ill. 448.) Where, however, the allegations of the indictment are sufficient to inform the plaintiff in error of the charge made against him to enable him to prepare his defense a bill of particulars is unnecessary. (*People v. Cox,* 340 Ill. 111, 114; *People v. Birger,* 329 id. 352, 366; *People v. Poindexter,* 243 id. 68.) The facts alleged in the indictment were not complicated nor were the charges vague or indefinite, and the plaintiff in error was sufficiently advised of the charge against him.

The right to a severance depends upon whether the defense of one defendant is so antagonistic to the defense of other defendants that a severance is necessary to assure a fair trial. It is largely within the discretion of the trial court whether a separate trial shall be granted to a defendant, and in the absence of an abuse of discretion the trial court's denial of the motion will not be held to be error. *People v. Fisher,* 340 Ill. 216; *People v. Lawson,* 331 id. 380; *People v. Birger, supra; People v. Corbishly,* 327 Ill. 312; *People v. Wood,* 306 id. 224; *People v. Gukouski,* 250 id. 231.

Rich testified to certain acts and conversations by himself, Sefried, Summers and Bailey when the plaintiff in error was not present, and the plaintiff in error contends that such testimony was prejudicial to him and was sufficient basis for his motion for a separate trial. The testimony of Rich tended to show that there was a conspiracy, joined in by the plaintiff in error, Sefried, Summers, Bailey and himself, to commit a felony. The Criminal Code, in a proviso to the section defining involuntary manslaughter, provides that where an involuntary killing shall happen in the commission of an unlawful act which in its consequences

naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder. Where several persons conspire to do an unlawful act and another crime is committed in the pursuit of the common object all are alike guilty of the crime committed if it is a natural and probable consequence of the execution of the conspiracy. (*McMahon* v. *People*, 189 Ill. 222; *White* v. *People*, 139 id. 143; *Spies* v. *People*, 122 id. 1, 226; *Hanna* v. *People*, 86 id. 243; 1 Wharton on Crim. Law, (12th ed.) sec. 268.) An absent conspirator is equally guilty of another felony committed in the execution of the crime to which the conspiracy relates. *People* v. *Basile*, 356 Ill. 171; *People* v. *Billburg*, 314 id. 182; *Brennan* v. *People*, 15 id. 511; 2 Hawkins' P. C. (8th ed.) p. 442.

It was not necessary that a conspiracy be charged in the indictment to permit the introduction of testimony that a conspiracy existed, and where a conspiracy is established every act or declaration of any of the conspirators in furtherance of the common purpose is regarded as the act or declaration of each of them and may be proved against all. (*People* v. *Levy*, 351 Ill. 110; *People* v. *Piech*, 333 id. 293; *People* v. *Looney*, 324 id. 375.). The fact that the plaintiff in error was not present at the time Green was killed was not a valid reason for granting him a separate trial in view of the evidence in the record.

It is contended that instruction 8 given at the request of the People was erroneous because it authorized the jury to find the defendants guilty of the crime of murder whether present at the killing and whether the person firing the shot was identified, if the shot was fired in furtherance of the conspiracy or if it may have been fired by Wiley Green when necessary to save his brother's life or prevent him from receiving great bodily harm. The instruction was not accurate, because it referred to the shooting by Wiley Green as being necessary to save his brother from

losing his life or receiving great bodily harm, while the shooting did not have that effect. The jury, however, would not misunderstand the instruction in that respect. It reasonably might be anticipated that an attempted robbery would meet with resistance, during which the victim might be shot either by himself or someone else in attempting to prevent the robbery, and those attempting to perpetrate the robbery would be guilty of murder. *People* v. *Krauser,* 315 Ill. 485, 505, 506.

The contention that an instruction upon the law of manslaughter should have been given is without merit. The theory that if the fatal shot was fired by Wiley Green the offense would be no more than manslaughter is in conflict with the proviso in the section of the Criminal Code defining involuntary manslaughter, to which reference has been made. A killing which happens in the prosecution of an unlawful act which in its consequences naturally tends to destroy the life of a human being is murder. In this State an accessory before the fact may be indicted and punished as principal. (*People* v. *Snyder,* 279 Ill. 435; *People* v. *Barrett,* 261 id. 232; Cahill's Stat. 1933, chap. 38, div. 2, sec. 2, p. 1068; Smith's Stat. 1933, p. 1080.) Accessoryship presupposes premeditation, which is incompatible with manslaughter. (1 Wharton on Crim. Law, (12th ed.) sec. 272.) In view of the statutory provisions cited, a verdict of manslaughter on the evidence presented would not be authorized, and therefore there was no necessity for giving an instruction upon that subject. *People* v. *Grant,* 313 Ill. 69, 83; *People* v. *Schultz,* 267 id. 147, 156, 159; *People* v. *Krauser, supra.*

It is contended that the argument of one of the prosecuting attorneys was prejudicial to the plaintiff in error, and a number of such statements are set forth. One of them is, "All we have here in this case is jail-birds, gangsters, robbers, thieves and murderers," and another is that the defendants were "gunmen." There was no evidence

that the plaintiff in error was a jail-bird, nor that he carried a revolver, although he associated with certain of the defendants, as testified by the witnesses for the People, and as an accessory he would be guilty of all the results of their use of a gun in the prosecution of an unlawful purpose. It is improper for the prosecutor to do or say anything in argument the only effect of which will be to inflame the passions or arouse the prejudices of the ·jury against the accused without throwing any light upon the question for decision. (*People* v. *Bimbo,* 314 Ill. 449; *People* v. *Redola,* 300 id. 392.) The prosecuting attorney has a right to denounce a defendant as guilty of the crime charged where there is evidence to support the argument, (*People* v. *Pargone,* 327 Ill. 463,) or other characterization may be made which is likewise based upon evidence. (*People* v. *Rooney,* 355 Ill. 613.) No objections appear to have been made to any of the statements set forth in the brief of the plaintiff in error as objectionable. Any irregularity in argument which is not objected to must be deemed to have been waived. (*People* v. *Wilson,* 342 Ill. 358; *People* v. *Carson,* 341 id. 11; *People* v. *Weil,* 243 id. 208.) If the testimony on behalf of the People were believed by the jury to be true, the defendants and the plaintiff in error were equally guilty, and they received the same sentence. The contention of the plaintiff in error is without merit.

It is contended that the testimony of the accomplice, Rich, is unworthy of belief, and that the evidence is insufficient to support the judgment. The testimony of an accomplice, though competent, is subject to grave suspicion and should be acted upon with great caution. Nevertheless, if, when all the facts and circumstances in evidence are considered, such testimony, even when uncorroborated, is of such character as to prove guilt beyond a reasonable doubt, it will authorize a verdict of guilty. (*People* v. *Jenkins,* 353 Ill. 152; *People* v. *Levy, supra; People* v.

*Erickson,* 338 Ill. 542; *People* v. *Buskievich,* 350 id. 532.) While the only testimony as to the identity of the persons who committed the crime is that of Rich, there are certain corroborative facts and circumstances to which reference will hereafter be made.

It is argued that even if the testimony of Rich be true the judgment must nevertheless be reversed, for the evidence shows that new plans were made by the men after they parted from the plaintiff in error and on their way to the home of Rosier Green, and that as the plaintiff in error was not with them he did not participate in making the plans which immediately preceded the killing of Green and he was not a co-conspirator. What was said and done by the men after they parted from the plaintiff in error was not in the formation of an entirely new conspiracy but was merely an agreement upon the execution of the details of the conspiracy already formed, and the evidence of what was said and done by any of the conspirators in furtherance of the common object was admissible against all. (*People* v. *Looney, supra.*) Rich admitted his own guilt but testified that he had been promised nothing by anyone on behalf of the People. Upon the question of the sufficiency of the entire evidence it appears that the killing of Green was by persons who went to his place in an automobile. It is established that there was more than one present when the shooting occurred. Rich admitted his part in the attempted robbery and implicated the other defendants. A doctor testified that he examined Sefried's left ear after December 8, 1933, and there was a new scar at about the center of the ear. Witnesses testified to statements made by Bailey and Summers which implicated them and which were corroborative of Rich's testimony. An apparently disinterested witness testified to the fact that Rich and the plaintiff in error talked together the morning after the homicide, which is corroborative of the testimony of Rich. There is nothing in the evidence to show that Rich bore the

plaintiff in error or the other defendants malice. Where there is sufficient evidence to convict and the verdict is not palpably contrary to the weight of the evidence this court will not substitute its judgment for the jury's verdict merely because the evidence is conflicting. (*People* v. *Coniglio,* 353 Ill. 643; *People* v. *Herbert,* 340 id. 320; *People* v. *Buskievich, supra; People* v. *Nusbaum,* 326 Ill. 518.) It was the province of the jury to decide whether the evidence proved the guilt of the plaintiff in error beyond a reasonable doubt. The rule is no different where the defense is an alibi. (*People* v. *Fortino,* 356 Ill. 415; *People* v. *Martin,* 304 id. 494.) We cannot say that the verdict is palpably against the weight of the evidence.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*